Insurancerising Justice ...versus Great West Life Insurance. Good morning. I'm Barry Epstein of the Epstein Law Firm, Rochelle Park, New Jersey. I represent the appellant, Franny Fite, and I would request approximately three minutes for rebuttal. That's fine, Mr. Epstein. Good morning. Thank you. There are four global, big-picture issues here, I think, on this matter. One is whether a trial court should read into the minds of a jury. Number two, whether there was, in the totality of the evidence, a sufficiency to support this jury's verdict. In other words, was there a rational, some rational basis for it? Thirdly, that we must recognize the extraordinary leeway and the broad standard that juries should be allowed. I must comment immediately, both of us have cited, I think it's called Daniels versus the Twin Oaks nursing home case, and the respondent does not indicate in the very next sentence that the case stands for, that even in juries making inferences, that it's recognized just by definition, that there always is a certain amount of conjecture that is allowed and is recognized just simply by the definition of the word conjecture. Accepting the fact that we give considerable leeway to juries, what would you base, what would be the evidence of injury here? I'm aware of how the car went off the road and it knocked the guardrail down and burrowed into the ground and so forth. What's the evidence of injury here? How do we know he didn't have the seat belt on the whole time, it came to a halt and he then undid it? Well, no. I think we know that the investigators and everybody at the scene, and I believe as conceded by the pathologist, that the body had been bounced around in the car. Wait a minute, there wasn't a mark on his body, isn't that what they said? There was no visible mark on his body, and that's another, that's a problem when I think with the district court in its final opinion here says no visible body, no apparent external injuries, and that's what was always harped on by the defense in the case, and in particular when they examined my pathologist at depositions. But we also know that, and at least circumstantially, I think that if this gentleman had lived, I think we would dare say that for a number of days, if not weeks, after an accident of this nature, he would have been sawed. He would have probably had a whiplash. He probably would have had some complaints of pain. You feel they could infer it from, based upon what the car went through, you could infer that he was bounced around inside the car even if he had his seat belt on? And I think when you look at, first of all, we know in this case- Let's say that's so. Okay. Now, your whole theory of the case is he did not have a heart attack. That was our preliminary theory, and I- It was your theory, sir. It was our theory, there's no question about it. Now, how can the jury find from that, that this bouncing around in the car that they found, that this caused him, that triggered, I forget the exact word, you know what I'm talking about. I understand. What about a heart attack? How could they find that from your record? There's two components to that. When we put on our case, we tried it on the notion, based on circumstantial evidence, that he died from some injury, and our argument was, this is our accident. You had a defective autopsy. There was good reason to do a head and a neck examination. And at the end of the day- And that wasn't done. Dr. Sothi could have done more. I don't disagree with you. No. At the end of the day, those motions were on the heart attack theory, and so what you have in here is the defendant putting on a case that the sole cause of the accident was this old myocardial infarction. And so what we wind up here with is a jury with- You disputed, but you disputed that theory, did you not? I mean, that was the essence of the plaintiff's case. There was no heart- But once the defendant put it in play, and the defendant came forward with, I have to acknowledge, at least competent evidence that Dr. Fite died of an old heart attack, I was then, I think, rightfully in a position to say, well, look, you had this tremendous accident. Assuming he had a cardiac within six months, and I think that was generally the medical testimony, that this scar was anywhere from recent to within six months. I think it was certainly within the plaintiff's rights once that theory was put into play to say to the jury and to argue to- Based on what, though? In other words, you didn't have a jury of MDs. A jury is lay people. Now, what is the medical evidence that that bouncing around, or whatever it happened to him, we don't know, that that triggered? What would you base that on? Doctor's happy he conceded. He said it was a possibility or something. Well, he actually said that if Dr. Fite had not died from a heart attack, and that jury could conclude that, if he had not died from a heart attack, that the most likely cause of death was either a head or a neck injury. Now, that doesn't mean he necessarily had to die from a head or neck injury, and I think that testimony is around page 170 in Dr. Zappi's testimony, and I could cite it for you that then the next most likely cause was a head and neck injury. We went through this whole colloquy where Dr. Zappi said, well, I didn't have toxicology, and then I asked him to assume that the toxicology report was clean. Would you not agree? And I think he says here at page 169, he says that's true. He says that's true, but we didn't have the toxicology at that time. That at a minimum, that at a minimum, and I'm still trying my case on whether an injury killed him, that at a minimum tells us that it would be fair to conclude, or at least infer, that there had to be a head or a neck injury. All right. In New Jersey, you do need, do you not, an expert report that will link an injury to the ultimate death? Yes. I think the way it works here is, and I say that there's a... Well, my follow-up question would be, where in your expert reports did you link the injuries to the cause of death? I think where we link it, Your Honor, is that he was, it's clear that he was more susceptible to a heart attack. There was a, the jury was... Excuse me. I don't mean to debate the issue with you, but your expert reports, I don't think, said he was more susceptible to a heart attack. No, but Dr. Zappi said it. If I understand what his appeal is now, based on the ruling that the court made on the Rule 50B motion... I'm asking about your experts. Your experts... My experts, I agree. My experts did not testify, and one of them was precluded from testifying on the injury, which is a separate issue, which I think warrants this court's attention. My experts did not testify that this accident triggered the heart attack. I acknowledge that. But you're hiding the whole thing on the coroner's remark. Well, but those motions, and we're not, we're not here on a cross appeal. Those motions ultimately were denied after they were reserved at trial. There was a motion that he stepped away. I argued that the circumstantial evidence was such that if Dr. Pike had not died from an old heart attack, and that was not there, what did that leave? He had to die from something. Well, Judge Van Antwerpen had been asking you about triggering event or so forth, which is really question number three in the verdict discourse. Yes, of course. But you didn't, and I just asked you what your experts' reports were based on. They did not link any injury to a heart attack. So I don't see the basis for question number three in the verdict sheet. I do see a basis for number one, and the jury found that there was an injury. Well, you know, the trial judge was skeptical, but all right, let's take it as a given they found injury. But then question number two says, really the proximate cause. Did those injuries approximately cause the plaintiff's death? And they said no. I would think you stopped there. I don't know why you get to question number three, because your experts did not in any way link the accident to a heart attack. They did just the opposite. The rule of this case was before we came to this court, that the plaintiff had presented his proofs and there were motions to dismiss on the bodily injury claim. Ultimately, the judge denied those motions for the arguments that I made at the time of trial, which presumably was there was circumstantial evidence to conclude a bodily injury. Now we're looking at the whole record, and I think if you look at the confluence of testimony of Dr. Zappi, that he was more susceptible. The fact is concerning. Sir, I asked you about your case, your theory, your experts, and your experts have to establish a proximate cause. And I thought reading your expert reports that they did not. Their focus was on head and neck injury. Not both of them, but certainly Dr. Duong, who was precluded from that. And I assume that that's one of the reasons why the court asked. All you have is the remark by the coroner, the guy that did the autopsy, but it was that it was possible, but not likely that the preexisting condition could have been triggered. Would that be enough to establish an inference? I think the possibility is not enough. I know that, but I think when you look at the context of all that testimony, that Dr. Zappi's credibility was seriously in play for him possible to that point. I don't think the jury was bound to accept a cross-examination. Well, no, wait a minute. As I said, you didn't have a jury of MDs. As Judge Fuentes has very correctly said, you've got to, in your case, have medical testimony to establish this. You don't have it. The only thing I can find in the record anywhere is that those questions of the guy that did the autopsy on cross, and it doesn't seem very firm to me. It seemed to me when I asked, when I had the flow of those questions to Dr. Zappi, and then I said to him, would you not agree that in view of the fact that you can't rule out the head and the neck, and in view of the fact that he was more susceptible, isn't it likely, doctor, that this accident set in motion and chain events to trigger this old heart problem? And he says possible to that. I don't think in the context of the flow of that testimony that his credibility or his lack of credibility requires the jury to accept his answer of possible when I think the whole flow of the line of questioning calls out for him to say, yes, it is probable. Because he said, by the same token, in the same very several pages, he conceded that it was likely, if he was wrong, that the death was caused by a head and a neck. It sounds to me like your adversary raised a Rule 50A motion. I guess Dr. Zappi's testimony wasn't in the record at that point. It was at the end of the case. Well, it depends when they made the motion. Did they make it after your case? One made after my motion for reconsideration on Dr. Duong. Then there was one made when I rested. And then there was one made after all the evidence. That's the 50B motion. No, because when Judge Ackerman, and it's in the transcripts here, I have the, when Judge Ackerman ultimately said after the trial, he issued an order indicating all these motions were reserved. The defendant's motions are denied. And he left open an application under 50B, which then was briefed. And then the court granted that motion. It sounds to me like you could have granted the testimony wasn't in the record yet, but in any event, is that your, is that your Dr. Zappi's testimony? That's your best evidence as to, as to the connection. I think that the Dr. Zappi testimony is strong evidence. And I also think taken in context with the, with the testimony of the plaintiff's expert, Dr. Duong, who indicated the reason why it is important to do a head and neck injury. As a matter of fact, in this case, the jury, I believe not only asked for the complete transcripts of Dr. Zappi. And I think they also read during deliberations, Dr. Fish's and Dr. Duong's testimony. So this jury was really focused in obviously on the medical aspects of the case. And I think when you look at the totality of the case, which is where we are now under a 50B ruling, that there was enough there under, under what the jury's province is to make the case. I think, I think they got it. Okay. I suppose I'll have to wait for rebuttal to talk about Dr. Duong, unless there are any other questions. I mean, I had, I think there are legitimately 10 factors here, which justify this verdict. If you go through, go through all of it, including the Dr. Zappi testimony. We have to get to your adversary, Mr. Epstein. We'll get you back on rebuttal. Thank you very much. Good morning, your honors. I'm Michael Zaretsky of Corporation Good, Carlton Garrison, representing Great West Life. You know, Mr. Zaretsky, I have some grandchildren that have talked me into taking to the amusement park on occasion. We've gone on some pretty wild rides, but quite frankly, I would not want to have that automobile went through, went through that maneuver going off the road. Couldn't the jury speculate or not speculate, but infer from all of that using common sense that this guy must have been injured in some way. I mean, that's a pretty horrendous set of circumstances, you know, down the slope and knock down the guardrail and chain link fence, and you burrow into the ground. Couldn't a jury infer from that? Your honor, I don't want to hold you to the first term you used, but I think in fact they had to speculate to do that. Well, are they speculating or are they inferring? I think they're speculating. The inference is not based on, if they are inferring, it's not a proper inference because it's not based on evidence with which they were presented. In fact, your honor, I mean, basically here, the timing is very key. We don't even know that Dr. Fite was alive when his car left the road. There was no evidence of that. The testimony was there were skid marks on the road. So we don't even know at what point, if his body bounced around, where he was in this sort of continuum. The plaintiff, in order to prevail, needs to, there were basically two possible scenarios. The one we are talking about is any injury, any injury at all, and that's what the jury was asked to find. He struck a guardrail and then went down 600 feet down an embankment. His body was found tossed in the car, strewn throughout the car. Why couldn't a jury conclude that there was an injury? Because they have to be presented with evidence of the injury. That's the evidence. They're inferring from the manner in which the accident occurred that he was injured. They're inferring from that, but that's not a proper inference to draw, your honor. They have to have some evidence of an injury, and we're not left with a fancy. Well, what about the Supreme Court, New Jersey Supreme Court in Brennan? Didn't they say you don't need an expert or evidence at all, any testimony? You can just sort of look at what happened and infer, infer injury? No, I disagree, your honor. I think in the Brennan case, the issue of whether there was an injury suffered by the plaintiff or the plaintiff had an injury was not a question in the case. The question was, was it caused by the accident? And was it, in fact, to what extent was it exacerbated by the accident? It sounds like you're requiring direct evidence and you're excluding the possibility of circumstantial evidence. No, no, your honor. I think there could be circumstantial evidence of an injury, but there'd have to be some evidence of that injury. And I mean, whether it's objective in the case of the Brennan case, because it was not a case involving death, the plaintiff was around to say that I've got pain. It was, I think, believe in her back or her shoulder. She had an expert witness testify that she had a pre-existing condition related to some bony malfunction, I think, a bony structure, and that it was exacerbated by whiplash in the accident. Well, supposing, supposing we were to defer to the jury's conclusion that there was an injury, does that mean Mr. Epstein wins the case? No, no, because, but you're saying he might have been dead before he went off the road. We don't know. Of course, that's a possibility. And that would, that would prevent the jury from reaching that, that, that verdict because he wouldn't have felt anything. That's right. You can't be, I would submit that the law, I don't, I think it's, I haven't found a case, but you can't be injured if you're already dead. Yeah. Okay. But I think that's what he's saying. Judge Fuentes, in response to your question, the injury only gets to one point. And as you pointed out on Mr. Epstein's argument, the jury rejected the theory that the injury was the cause of death, the predominant, efficient cause of the death. I would agree with you. We think that Judge Ackerman should not have posed question three to the jury, and we think that instruction was erroneous. And as a side matter, I should say, I don't think we were required to. Did you object to question number three? Yes, I did. Okay. All right. And I objected to the instruction. But you didn't cross appeal. I don't think we were required to, Your Honor, because under, if I may just refer, there's nationwide mutual versus Cosenza 258 F3rd 197 at page 205. That's this court in 2001, and citing to a Morley Construction versus Maryland Casualty at 300 U.S. 185, 191, a 1937 case, in fact. If the prevailing party, the appellee, is not looking to expand any relief that was granted below or increase any right or decrease any right that was granted to the appellant below, there's no requirement to cross appeal. And in essence, I think there are many cases that support the fact that the court can affirm a ruling even if it thinks that the basis for the ruling was wrong, if there is some other basis for the ruling. And that really relates more, I think, to the new trial issue. I think Mr. Epstein, if I understand what he was saying, is basically trying to hang everything on that cross-examination of Dr. Zappe, the person that did the autopsy. That remark when he asked him about triggering, he's trying to hang it on that. Tell us why that's not sufficient. Because, first of all, Dr. Zappe, and this may be a formality, was not called as an expert witness. He was a fact witness. He's the coroner or the medical examiner who performed the autopsy. Number two, all he said, as I think Judge Van Antwerpen, you pointed out, was that it was possible. He would never concede the likelihood. He did not testify to the likelihood. He just said it's a possibility. He never said there's a reasonable degree of medical probability. He never established the linkage. And I find it, frankly, kind of ironic now that Mr. Epstein, who is relying on Dr. Zappe's testimony to sort of make this link, also argues that he's not credible, which seems to me that you can't have it both ways. But what he's saying is his refusal to concede Mr. Epstein's point, to make that link, makes him not credible. And therefore, the jury could properly conclude that had he been telling the truth, he would have made the link. And the link isn't made. There's no establishment of the triggering of a cardiac event by some injury. And the jury had to make a leap. That's what Judge Ackerman found, and we think properly so. There was no basis for the jury to make that otherwise. How about the fact that they weren't pursuing heart attack in the plaintiff's case? Does that create a problem for them? Well, I certainly thought it was ironic to have that argument at the end. I can tell you that we think Judge Ackerman should have granted the motion at the end of the plaintiff's case. We were then faced with the decision of having to decide, do we put a case on and maybe didn't have the courage to just rest at that point, put a case on, and moved again, and Judge Ackerman reserved again. And then when the jury verdict was rendered, we renewed the motion. Judge Ackerman reserved. Did your presenting that heart attack defense provide the plaintiff an opportunity or a basis for asking or for relying on the third question? In other words, whether the accident set in motion a chain of events that activated a preexisting condition? Well, I don't think so, Your Honor. By putting on, and I wouldn't call it, so to speak, the heart attack defense, we put on the evidence of what the cause of death was, according to the medical examiner's offices, not our witness. I mean, Great West had no involvement in this case until a claim was made for the death benefit. The autopsy had long since been performed. But the fact that we put on evidence of a heart attack or a cardiac event, could have been an arrhythmia, there was testimony about that as well, doesn't establish the link between this, what I would say, phantom injury and the ultimate death. It appears, obviously, at the end of the day, that the plaintiff recognized that they had no way of establishing an injury that caused death. And they now went for this argument about it somehow triggered this chain of events that resulted in the cardiac death. But there was no testimony linking the two. Dr. Zabby never linked them. Certainly neither Drs. Fish nor Duan, the plaintiff's expert, they weren't even questioned about it. So that link was never established. And that's why we objected to both the instruction and question number three, because the case law, I think, is very clear. There has to be some evidentiary basis that warrants giving such an instruction. Otherwise, you clearly confuse the jury. And the jury answered no to question two, which we think was the really pertinent question. When I wonder about that issue of confusion, might this question have confused the jury such that a new trial is the appropriate disposition of this appeal? No, because we think question three never should have been asked. It's not a matter of how it was framed. There was no reason to ask it. This jury, in essence, found for the defendant by answering no to question two, meaning that they found that while there was an injury, which we think there was no evidence to support that, that that injury didn't cause death. It was not the predominant, inefficient, or sometimes referred to as the proximate cause of Dr. Fite's death. Why did the district court deny the motion and then grant it a couple of weeks later? I have no idea, Your Honor. I couldn't possibly answer the question. It surprised us to some extent. Was there a lack of record or something at one point or something? No. No. I mean, it was a full record. It's surprising. It's an individual that is in such good health, as you read the record, so fit, so active, so free of any apparent pre-existing injury, suddenly dies, and free of apparently any cardio problem. You wonder if, indeed, he was involved in an accident that produced injury. Well, I'm glad you pointed that out, Your Honor, because, in fact, he was not in that kind of good health. And that was ignored, really, by both of the plaintiff's experts who dismissed any cardiac event, as Your Honor's pointed out when talking to Mr. Epstein, because they just rejected the possibility of any cardiac event because there was 50 percent or less occlusion of the affected arteries. But what they ignored, and Dr. Zappe testified to it on his direct examination, that while he talked about a 50 percent occlusion on his gross examination of the vessels when he was examining the body. The scarring? Excuse me? The scarring is what you're talking about? No, not the scarring. The actual arteries themselves. He looked in the arteries and eyeballed, as I think was his testimony, that they were approximately 50 percent occluded. But 50 percent doesn't normally cause heart attack. Yes, Your Honor. I understand what you're saying. But then he also performed a microscopic examination of these arteries. And he testified to that, both on direct and cross examination. And he characterized that as moderate to severe, which is, as he pointed out, somewhere in the 70, 75 percent, even 80 percent occluded range. And he testified that at first when he did this gross examination, he thought it was only 50 percent. But that's why he does the microscopic examination. And there he found it as much as 80 percent occluded, which even the plaintiff's experts, when they testified, said 50 percent is no big deal. 70, 75 percent is when I would be concerned. This is what Drs. Fish and Duong said. Well, in fact, Dr. Zappi's testimony established that that was the level of occlusion and that the heart had been damaged. So that, and Your Honor, I mean, we read about it all the time, people who have heart attacks who had no idea that they had any heart condition or difficulty before, had no symptoms, were active, et cetera. The fact is there was an autopsy here and whatever deficiency plaintiff wants to argue about it, the cardiac portion of it was not defective. Dr. Zappi went down to the microscopic level and found this occlusion. And plaintiff never chose to rebut that testimony, I might add. Never called her experts back in to say, no, either, A, we disagree, that's not reflected in the autopsy report, or, B, there's no basis for saying that on microscopic versus gross. I mean, Dr. Zappi went through a very detailed explanation of what he did in the autopsy and how he came to the conclusion that these were severely occluded arteries and, therefore, why he concluded that this heart was dying and he had a heart attack or cardiac events, could have been arrhythmia, which is, I think, ultimately what the end result of a cardiac event is, the arrhythmia in the heart stops. Do you want to address the in limine motion? Because I think your adversary is going to. Sure, thank you, Your Honor. I mean, obviously, the standard there is there has to be an abuse of discretion by the trial court. And Judge Ackerman had before him extensive deposition testimony of both of these experts. There was a motion filed by the defendant. The other side brings up the point that they didn't really have an obligation to question their witness. No, we didn't have the obligation to even take their witness's deposition. Their opinion should have been established through their reports. And that's the rules, typically, and that's certainly the rules and local rules in district court in New Jersey, is the experts limited to what they put in their reports. Yes, they didn't have to ask questions at the deposition, but then when we made the motion, nobody prevented them from getting affidavits from those doctors to rebut what we were arguing in our motion. In fact, the appellant basically just dismissed the motion in limine, filing a two-page letter saying that there was no real need to even address it because suggesting the magistrate judge had said we couldn't make that motion. The judge never used the term in ruling on the motion initially. He never used the term differential diagnosis. Is that a problem? I think he mentioned it briefly in the motion to reconsider, but he never really characterized Dr. Duong's testimony as differential diagnosis, as methodology. Is that a problem? Well, no, because that wasn't even presented to the judge on the original. We moved in limine. The plaintiff put in virtually no opposition. All they said was they can't make this motion in limine because there's already been a summary judgment motion, and essentially this has been disposed of by the court's denial of the summary judgment motion. So they never argued that this was a differential diagnosis. They never offered any proofs, certifications, affidavits. On the reconsideration motion, they came up with this certification, which as I suspect your honors may be familiar, it's similar to a federal declaration. And Dr. Duong attempted, but frankly, we think weakly and not sufficiently, and that's what Judge Ackerman found. And Judge Ackerman addressed the differential diagnosis argument in the reconsideration decision. Mr. Zerutsky, your time is up. I thank you very much for your argument. Thank you, your honors. Mr. Epstein. Your honors, if one reads the document... Mr. Zerutsky, can I just ask you one thing? Yes, sir. I don't mean to slip it. Of course. Suppose he was dead before he went off the road. How can you find an injury? Well, you have the Dr. Sagelbeck testimony, and there was also testimony that Mr. Frey apparently was clutching his chest or biting his shirt. And as Dr. Duong said in his deposition, which was before the court on the Illuminati, that just showed he was in pain at the time. That's all it shows. It doesn't show that necessarily he had an injury to the chest. It could well have been an injury to the chest where he struck the wheel and he wouldn't have to have a visible injury, and that happens frequently. And it could also show when he was biting his shirt, which that's an indication he was not dead when he left the road, because when he was found 600 feet off, he was in a clutch biting position, indicative of obviously being in pain. But that could have been before he left the road, couldn't it? Unlikely. Very unlikely, based on the scenario. Well, did a doctor say that, to a reasonable degree of medical certainty, that he could not have been dead before this happened? But my doctor said, which was wrongfully held out of the case, that he died from a head or a neck injury. That's what my doctor said. And the trial court's assertions that my client had vague experience, having done 3,000 autopsies, is grossly flawed. For the trial court to say that Dr. Duong, who relied upon infinite articles, is grossly flawed. The record before Judge Ackerman on that eliminae was that Dr. Duong had read about 20 articles and relied upon those articles. And they were authoritative, reliable, respected articles that pathologists use all the time. But don't you have to rule in, first of all, all possible causes, and then rule them out? Isn't that how you have to rule them out? In this case, it didn't require the universe of considerations. In this case, he said, I've ruled out what it is. And the only other thing, and it's in his transcript, which the judge, he says he had to die from something. I've ruled out the cardiac event. The only other thing that could be considered in the totality of the circumstances in a serious auto accident like this is, and the literature says, you've got to do a head or neck. He said, in all the autopsies he'd ever been involved with, and he worked for, I think, the Westchester Medical Examiner. In an accident of this nature, he had never seen an autopsy performed without doing the head and the neck. There's no doubt they criticized what Dr. Zalpi did, and perhaps he should have done more. But I'm talking about the differential diagnosis to establish... I don't believe that the magic words need to be used, that I did a differential. He said, I ruled this out, I examined the records, I looked to see what it was, and I determined that it had to be. I thought he said, basically he said, he didn't die of a heart attack. He died of head and neck injuries, and isn't that essentially a net opinion? No, it's not, because what he said was, in a serious accident like this, you have to consider a head and neck. The head and neck was not done, in effect, in the certification. I understand that, but there was really no rationale, and this is what the district judge said. No methodology, no rationale as to how he... I think, frankly speaking, I think that's a net conclusion. I mean, that's what a pathologist does. I think, essentially, that the district court was substituting, in some fashion, what it presumed was the knowledge, or the expertise, or the methodology that the pathologist brings to bear when reviewing all of these records. This was not junk science. This was not a PCB, or whatever those chemicals are called, that we're talking about in Paoli, where we had a 10-day hearing, and the judge examined the methodology. This is a rather, I think, with all due respect, this was a rather straightforward medical issue, given the facts, and given the fact we had an autopsy, and we had all the medical records concerning the deceased. Okay. Any questions? Actually, I see you said there was an error in not holding a hearing. Your expert did get to put in an affidavit, or a declaration, or whatever it is, right? He did, and he did say, this is what I did, this is how you do it, and he did say, although I wasn't asked at my deposition, what I did here was a differential diagnosis. Now, frankly, the judge had his mind made up. I think I addressed Dr. Duong's qualifications when he testified, and I actually said to him, Your Honor, you've had the benefit of this man's experience. You know how many orders, you know he has testified that the articles that he read were reliable. I asked the judge to revisit the issue, and he did. I want to say one other thing, because one never knows where this case is going, but I think it's appropriate for me to say, if this matter is remanded for further proceedings, as opposed to the verdict being reinstated, which is our primary relief, I really have to suggest to the court that this matter really be with another judge, because I think there's a totality of things here, especially on the Illuminati, and so forth. Did you raise that in your brief? No, I didn't. Well, then how would it be appropriate to raise it here? I'm raising it because I don't know what the court's going to do. Well, we'll take that into consideration.